## Case No. 13,916.

### THOMAS v. WOODBURY.

[1 Hask. 559.] 1

District Court, D. Maine. Feb., 1875.

BANKRUPTCY—PREFERENCES—PAYMENT OF NOTE—ENDORSER—EXPRESS AGENT.

1. The Act of June 22, 1874 [18 Stat. 178], is inapplicable to a suit in equity by an assignee in bankruptcy to recover a preference made in fraud of the bankrupt act of 1867 [14 Stat. 517], where the bankruptcy proceedings were compulsory and commenced prior to December 1, 1873.

2. The payee and endorser of a note, paid by the maker in the usual course of business to the holder within four months of bankruptcy proceedings against the maker, is not chargeable with taking a preference under the bankrupt act, when he neither received the money, nor procured, suggested, or aided its payment, even though he knew of the maker's insolvency.

3. Money paid to the endorser, or by his procurement or arrangement to the holder, by the maker, with intent to give a preference, the endorser having reasonable cause to believe the maker to be insolvent, if paid within four months of bankruptcy proceedings is a fraudulent preference under the bankrupt act.

4. An express agent, being an endorser who receives from the maker of the note endorsed money to pay it, and forwards the same to the holder, does not thereby personally receive the money. nor procure, suggest or aid in the payment of the note.

5. An endorser. who receives from the maker of a note part thereof, and loans him the balance needed to pay it, and with these sums does pay it, is not chargeable with taking a preference beyond the amount paid to him by the maker.

In equity. Bill by [William W. Thomas] the assignee of a bankrupt to recover from the payee and endorser of the bankrupt's

---

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

notes sums received by him in payment of the same as a preference in fraud of the bankrupt act of 1867.

The respondent [Eben Woodbury] by answer denied all reason to believe that his debtor was insolvent when he paid the notes, and averred that whatever payments the bankrupt made were to innocent holders of the notes endorsed in the usual course of business, and insisted that he could not be held liable for payments made to others without his knowledge, aid or procurement.

William W. Thomas, Jr., for assignee.

Almon A. Strout and Geo. F. Holmes, for respondent.

FOX, District Judge. This is a bill in equity brought by an assignee in bankruptcy, to recover from the defendant, the amount of three notes, payable by the bankrupt to the defendant and by him endorsed, and paid within four months of the commencement of bankruptcy proceedings, so as to constitute, as is alleged, a fraudulent preference within the provisions of the bankrupt act. The petition was filed against said Carpenter by his creditors on the first day of January, A. D. 1873, and this bill was instituted on the 11th of May, 1874, prior to the act of June 22, 1874 [18 Stat. 178], amendatory of the bankrupt law. These amendments are not applicable to and can have no effect upon the rights of the parties to this suit, as being a case of compulsory bankruptcy instituted prior to December 1, 1873. See opinion of Treat, J., in Singer v. Sloan [Case No. 12,899], and cases there cited.

Carpenter resided at Houlton in Aroostook county, and was a surveyor and scaler of timber and interested to some extent in wild lands and lumbering operations therein. His supplies were obtained from the defendant, who for many years has been a trader at Houlton in good standing, and also agent for the Eastern Express Company. The first note paid by the bankrupt, which is charged as a fraudulent preference, was for $1,200, and fell due October 14–17, 1872, and it is important to ascertain the standing and condition of Carpenter at that date, and whether he was or not insolvent. It appears in evidence, that besides his indebtment to the defendant on this note of $1,200, he was at that date also indebted to the defendant for supplies to the amount of about $2,500, and to Wm. B. Hayford, on account for more than $1,000. He had also become liable to the holder of five drafts, drawn upon him in June and July by S. M. Ward, and by him accepted, the whole amounting to over $2,-900. These drafts were payable some in ninety days, and some in four months, and although demanded were never paid by the acceptor or any other party. On October 14, the date of maturity of the $1,200 note, Carpenter sold all the real estate he owned to

Powers, and after paying the mortgage then outstanding upon this property, he had left about $3,700, barely enough to discharge the notes endorsed by the defendant. On that day, October 14, four of the paid acceptances, amounting to nearly $1,800, were overdue, one having fallen due on September 17th and the others October 4th and 5th.

There is no evidence that Carpenter had any other property on October 14, than the real estate which he then sold. The avails therefrom were not sufficient to pay fifty per cent. of his outstanding liabilities. Some of these liabilities were his negotiable paper which had gone to protest, and had been overdue for weeks, and which from the testimony of the bankrupt, he neither had the purpose nor ability to discharge. Under these circumstances, it is quite clear that on the 14th of October the bankrupt was hopelessly insolvent; and it is equally clear, that the defendant had good reason to know and believe such to have been the condition of the bankrupt at that time.

He must of course have well known the extent of his own liabilities on the bankrupt's account, and he also knew that the acceptances of the said drafts, or of some of them at least were not paid by Carpenter. The defendant in his examination taken September 23, 1873, states, "My impression is, that I first knew that J. C. Carpenter was in embarrassed circumstances in September, 1872. I do not think that I had any such knowledge until Elias Thomas & Co.'s draft was sent to me for collection. I knew before that, that he had some trouble in meeting his bills as they matured, but I did not know that he was on the eve of failure. I had no difficulty in collecting my own bills of him before that draft was sent me to my knowledge. * * * I think that I remember receiving a draft on Carpenter drawn by Mr. Ward, payable to Elias Thomas & Co. It was sent to me as express agent for collection. When it came, Carpenter was away. When he came back we notified him that it was there, and he said that 'he should pay no more of Mr. Ward's drafts.' "

This draft was for $319.69 dated June 16, 1872, on ninety days, accepted by Carpenter, and fell due September 19, 1872. It also appears that Herring, a notary at Houlton, on the 4th day of October, 1872, protested for non-payment, at the request of the Eastern Express Company, another acceptance of Carpenter's of one of the Ward drafts for $245.04 due that day and payable to Whitney & Thomas. Knowledge of the non-payment of each of these drafts by the bankrupt is therefore brought directly home to the defendant, prior to October 1st, and he is to be held chargeable as the law then was, with all the information which he could have obtained on reasonable inquiry, and it is quite manifest that with the knowledge of the non-payment of these acceptances, and of the bankrupt's intention not to pay

any further sums on Mrs. Ward's account, the defendant must have learned of the condition of the bankrupt, and that he was then utterly insolvent.

The defendant, in his deposition, has undertaken to explain away his statement made in his examination touching his knowledge of Carpenter's failure to meet his bills, &c., but in the opinion of the court with but little success. The statement given by a party, of his knowledge of the pecuniary condition of a bankrupt, made without assistance and before he is aware of any controversy in relation thereto, is always much more reliable and satisfactory to the court, than one subsequently prepared to meet the emergency of the cause. when it is manifest, that the former statements, if allowed to remain unchanged, are quite inconsistent with any valid defense.

The note of $1,200, was dated June 15, 1872, and payable on four ·months at any bank in Bangor, and was given to defendant in renewal of a note of Carpenter's for $1,150, dated February 15, 1872. This last note was received from Carpenter by defendant in payment for supplies, was negotiated by him to Margerson & Sons, and was discounted at a bank in Bangor, and not being paid at maturity, was renewed by the $1,200 note, the difference being discount, expenses, &c. When this last note fell due. it was in one of the Bangor banks, and Carpenter brought to the Eastern Express office at Houlton $1,200, to be forwarded to pay the note. This amount was received by McIntire. the clerk, and also financial agent of defendant, at the store of defendant, which was also the office of the express company, and was forwarded by the express company to Margerson & Upton, they being advised of the purpose for which the money was sent by Carpenter. by a letter written October 15, by McIntire in behalf of the defendant. This money was received at Bangor by Margerson & Upton and the note was paid thereby and sent to defendant.

It is not shown that the defendant personally had any part in the payment of this note, or that its payment was in any way instigated or suggested by him. So far as appears, it was the act of Carpenter, meeting his negotiable paper at maturity, in the regular course of his business, through the express company, a common carrier, bound to receive and forward the funds for that purpose. the defendant not being in any way an actor or promoter of the affair, or doing anything in that behalf. The acts of McIntire in forwarding the package of money were done by him as the agent of the express company. He was obliged to perform them and would not have been justified in refusing so to do, neither could Woodbury himself, being the agent of the express company. have declined to forward the package by the express company if he had received it for that purpose instead of his clerk McIntire; and

in my view, the payment of this note must be considered the same as if Carpenter had himself, without the knowledge or suspicion of the defendant, gone personally to the bank, and there paid and taken up the note with his own funds, and without the same being known by any other party.

The facts relating to the other notes are somewhat different. March 15, 1872, Carpenter being indebted to Woodbury for supplies. paid him on account thereof, $1,545, by his note on four months; this note was transferred by defendant to Twitchell & Champlain of Portland, and it was discounted at one of the banks in this city. When it fell due, Carpenter was not able to pay it, as his lumber was not through the boom, and to renew the same, made a new note for $1,606.80. dated July 15, payable to the order of the defendant in four months at any bank in Portland. This note was endorsed by defendant and sent by him to Twitchell, Champlain & Co., and the same was discounted, the proceeds being applied to the payment of the former note, the discount and expenses. This last note fell due November 15–18, and was paid by Carpenter under the following circumstances, as stated by defendant in his deposition. "Mr. Carpenter a few days before the note came due. I think on the 9th of November, came into my store which was also the express office. to send some money to Twitchell & Champlain to pay .his note, which we supposed was held by them. I think he made some inquiry as to the expense of sending the money. * * * We gave him the information. He said that he had been trying to get a draft to send in place of the money, and that he could not get one. 1 asked McIntire if we had any funds on which we could draw. He replied that there was a balance in Bangor due us of about $1,700. It was said by one of us that Carpenter wanted about $1,606 to pay a note to T., C. & Co. McIntire replied that he could let him have this check, and T., C. & Co. would give us credit for the balance. He counted out $1,606 and paid it over to McIntire. and requested him to send the draft and get his note." The defendant denies that there was previously anything said or done by him to induce Carpenter to pay this amount.

A draft of $1,700 was sent by Woodbury to T., C. & Co., drawn on Wheelwright, Clark & Co., Bangor, with directions to appropriate $1,606 to payment of Carpenter's note, and to credit defendant with the balance on account. which directions were complied with, and the note of Carpenter's was sent back to Woodbury. This payment was made by Woodbury. by his own draft, and was his individual personal act. and not in any respect, any thing done by him as agent for the express company.

Woodbury here becomes an actor in making this payment. He receives the amount of the note from Carpenter a week or more be-

fore its maturity, and when the time of payment arrives. forwards a draft drawn by him on another party for a larger amount, with instructions to pay the Carpenter note from the proceeds, and apply the balance to his credit on account. By so doing his own actions make him a recipient of the payment. The money is brought home to him. He receives it, well knowing that Carpenter is insolvent. and that he intends a preference. He aids and assists in perfecting and completing this preference, and does his part therefore in accomplishing a preference which he knew the law would not sanction and sustain. Knowing all that he did, the law required of him to withhold this payment, and prevent Carpenter from completing it; and he certainly should not have taken any part in aiding Carpenter in his purpose to defeat the provisions of the bankrupt act.

A third note was given by Carpenter to Woodbury, August 17, 1872. in payment for supplies, for the sum of $900, on four months payable at any bank in Portland. This note was endorsed by Woodbury to C. J. Walker & Co.. and was discounted at the First National Bank; it fell due December 17-20. A few days before its maturity. Carpenter went to defendant and informed him he had not money enough to pay this note. and wanted to borrow enough to pay it. and would pay in a few days. Defendant told his clerk to let him have enough money to make up what he was short, and to give him a draft on Wheelwright & Clark for $900, and take what bills he had and his due bill for the balance.

Carpenter paid McIntire $339, and borrowed of Woodbury $561. for which he gave his due bill, and the $900 draft was sent by defendant to C. J. Walker & Co., December 16, with instructions to pay Carpenter's note therewith. Walker testifies, he paid the note with this draft. and he thinks he returned the note to defendant. as it was customary with him to return notes when paid to the party from whom he received the money, and he had nothing to do with Carpenter in this matter. So far as the $339 paid to defendant by Carpenter. are in question, the case is in all respects similar to the payment of the note of $1,606. But it is claimed by the assignee that Woodbury having lent Carpenter the sum of $561, to pay the residue of the note, and it having thereby become Carpenter's property, and been subsequently applied to the payment. he has some right to recover this portion of the payment as being a fraudulent preference, as that paid by his own funds.

Such a ruling would certainly not be equitable or just as between the parties, and the assignee, demanding equity, should conform to it in his requirements. The whole is to be received as one transaction. Carpenter has not, in fact, paid from his own money, which his creditors had a right to expect should be applied to the satisfaction of their claims, anything beyond the $339, which belonged to him. The defendant has, in reality, paid from his funds the remainder of the note, and should not be held accountable to the estate therefor, as the estate of the bankrupt has not in any manner been reduced by such payment. Before this payment was made, Carpenter was indebted the full amount of the $900, and it could have been proved against his estate in bankruptcy. He has taken of defendant's money $561 to pay a balance due them, for which he is now indebted to the defendant. There has been in this transaction a mere change of creditors for this sum of $561, and the assignee has no cause of complaint in that behalf.

The testimony in the cause establishes that at the time of the payment of these three notes by the bankrupt, he was insolvent and that his insolvency was well known to defendant. If any doubt could exist in the mind of Carpenter, respecting the purpose and intent of defendant in paying these notes on the 18th of October when the $1,200 was paid, certainly there could be no possible question upon that subject in November when the second note was paid. At that time defendant could not but be aware of Carpenter's absolute refusal to pay his, Ward's acceptances, and that he had allowed them to go to protest; that he had in October, when the $1,200 note fell due disposed of all his lands to Powers, and had promptly paid therefrom his note for $1,200, the consideration of which had been supplies for his lumbering operations, of which he had personally received the benefit, and which from his conduct in paying it, instead of his overdue acceptances, defendant must have understood he deemed of such a character as to require at his hands protection and preference, rather than his other liabilities. This view must have been even more convincing and conclusive as to Carpenter's purpose in November when he came to defendant, money in hand. ready prepared to pay the full amount of the $1,606, also given defendant for supplies; and the court entertains no doubt that both parties well understood that Carpenter was to take care of and discharge this class of his liabilities to the entire exclusion of his other indebtment.

The law upon this subject of preference of endorsers by the maker of negotiable paper outstanding in hands of third parties was very fully examined by Leavitt, J., in 'Ahl v. Thorner [Case No. 103].

This was a bill in equity to recover of the defendants the amount of certain notes which had been paid by the bankrupts. It appeared that the bankrupts residing at Memphis, obtained the endorsement of Thorner who resided at Cincinnati upon their note for $5,000. This note was discounted at Cincinnati. It was not paid at maturity, and was renewed by the same parties. The renewal note fell due January 23, 1868. On

the 16th of January, defendant received from the makers drafts on New York for $5,200, with instructions to apply them to the payment of this note. These drafts were accepted by the holder in payment of the note, and the note was cancelled, the difference of $300 between the note and the draft was paid to the wife of the bankrupt. It appearing that the bankrupt was then insolvent, and that this note was paid with a view to a preference of Thorner over the other creditors, and that he had reasonable cause to believe the makers were insolvent, the court decided that Thorner's liability as creditor was such that the payment enured to his benefit, within the meaning of 35th section of the bankrupt act, and that he was liable to refund to the assignee the full amount so paid.

This case is identical therefore, with the present so far as the last two payments are involved, substituting the names of the parties in the present suit in that, with a change of the amounts, and it would present the very case now before us; and no reason can be given why it should not control the result in this suit.

In Bartholomew v. Bean, 18 Wall. [85 U. S.] 641, Miller, J., delivering the opinion of the supreme court says: "If the money had been paid to him," the endorser, "directly, instead of the holder of the note, it could have been recovered; or if this money or other property had been placed in his hand to meet the note, or to secure him instead of paying it to the bankers, he would have been liable. * * It is very obvious that the statute intended in pursuit of its policy of equal distributions, to exclude both the holder of the note and the surety or endorser from the right to receive payment from the insolvent bankrupt. It is forbidden. It is called a fraud upon the statute in one place, and an evasion of it in another. It was made by the statute equally the duty of the holder of the note and of the endorser to refuse to receive such a payment."

I am constrained by these authorities to hold the defendant chargeable for the amount of the second note of $1,000, and also for the sum of $339, paid by Carpenter in part of the $900 note, with interest from the date of such payments. The claim for the amount paid on the $1,200 note is more doubtful; but the conclusion at which I have arrived is, that defendant is not chargeable therefor. He never received this amount; in no way did this money come into his possession; he had no part in making the payment. Carpenter, through a common carrier, freely and voluntarily, and without any suggestion from the defendant, forwarded this sum, in the usual, ordinary course of business, to meet his note at its maturity.

The defendant neither did nor said any thing to cause this payment to be made by Carpenter, and is as innocent of all connec-

tion with that transaction as he would have been if absent from the country at the time. Being an entire stranger to the transaction I do not think he should be held chargeable for the amount thus paid; for if he is to be held accountable, every endorser aware of the maker's insolvency, and of his purpose to pay his endorsed paper, would be chargeable and liable to refund all such payments made within four months of bankruptcy proceedings, although his liability was entirely contingent, and he was without knowledge of such payment until long afterwards. The cases before cited, recognize the liability of an endorser when he himself received the amount, or has directly or indirectly aided in the payment by the maker; but I do not think they can be extended to cover the present claim for the $1,200, and for this amount the defendant is not chargeable. Decree accordingly.